1  Jesse Colorado Swanhuyser (SBN 282186)
2  ANACAPA LAW GROUP, INC.
   508 East Haley Street
3  Santa Barbara, CA 93103
   Tel: (805) 689-1469
4  Email: jswanhuyser@anacapalawgroup.com

5  Attorneys for Plaintiff
6  CALIFORNIA COMMUNITIES AGAINST TOXICS

7

8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA

10 | CALIFORNIA COMMUNITIES          | Case No. _____
11 | AGAINST TOXICS, a non-profit    |
   | corporation,                    |
12 |                                 | COMPLAINT FOR DECLARATORY
13 |              Plaintiff,          | AND INJUNCTIVE RELIEF AND
   |                                 | CIVIL PENALTIES
14 |         vs.                     |
15 |                                 |
16 | MATTCO FORGE, INC., a           | (Federal Water Pollution Control Act, 33
   | corporation, DOES 1 through 10, | U.S.C. §§ 1251 to 1387)
17 |                                 |
18 |              Defendants.        |
19

20

21      CALIFORNIA COMMUNITIES AGAINST TOXICS ("CCAT" or "Plaintiff"),

22  a California non-profit corporation, by and through its counsel, hereby alleges:

23

24  **I.    INTRODUCTION**

25      1.    This complaint seeks relief for ongoing and continuous violations by

26  Mattco Forge, Inc. ("Defendant" or "MATTCO") of the Federal Water Pollution

27
   Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "Act") and the
28

COMPLAINT                                    1

National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ and Order No. 2014-0057-DWQ ("Permit" or "General Permit"), resulting from those industrial facilities owned and operated by MATTCO at and/or near 16443 Minnesota Avenue and 7530 Jackson Street in Paramount, California (collectively the "Facilities").

2.     Millions of gallons of polluted storm water originating from industrial operations like those conducted at the Facilities pour into storm drains and local waterways during every significant rainfall event. The consensus among agencies and water quality specialists is that this pollution accounts for more than half of the total pollution entering surface waters each year.

3.     Industrial facilities, like the Defendant's, that discharge storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to such toxins, and harm the aesthetic and recreational significance Los Angeles' waterways have for residents of these communities and visitors alike.

## II.     JURISDICTION AND VENUE

4.     This is a civil suit brought under the citizen suit enforcement provisions of the Act.  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. §

COMPLAINT

1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

5.      On March 2, 2017 CCAT issued a sixty (60) day "Notice of Violation and Intent to File Suit" letter ("Notice Letter") to MATTCO, including its registered agent for service of process, for its violations of both substantive and procedural provisions of the Act and Permit.  The Notice Letter informed the Defendants of CCAT's intent to file suit against it to enforce the Act and Permit.

6.      The Notice Letter was also sent to the Attorney General of the United States, the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"), as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of the Notice Letter is attached as **EXHIBIT A**, and is incorporated by reference.

7.      More than sixty (60) days have passed since the Notice Letter was served on MATTCO and the federal and State agencies.

8.      Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court

action to redress the violations alleged in this complaint.

9.     This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

10.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

III.   **PARTIES**

11.     Plaintiff is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Rosamond, California.

12.     CCAT is a coalition of more than 70 non-profit corporations and community associations around the State of California.  CCAT is dedicated to working with communities to advocate for environmental justice and pollution prevention for the benefit of California's human and natural communities.

13.     CCAT has members living in and around Paramount, as well as throughout the Los Angeles River Watershed. CCAT and its members are deeply concerned with protecting public health and the environment in and around their communities.

14.     The unlawful discharge of pollutants from the Facilities into the Los Angeles River and downstream waters impairs the ability of CCAT's members to use and enjoy these waters.  Thus, the interests of CCAT members have been, are being, and will continue to be adversely affected by the Facilities' failure to comply with the

COMPLAINT                                    4

Clean Water Act and General Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant(s)' activities.

15.    Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

16.    Plaintiff alleges on information and belief that MATTCO is an active California corporation.

17.    MATTCO filed a Notice of Intent to Comply With the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") on June 25, 2015 ("2015 NOI").

18.    Upon information and belief, Plaintiff alleges that the true names, or capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to Plaintiff, who therefore sue said Defendants by such fictitious names.  Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained.  Whether or not MATTCO is associated with any other individual, corporate, associate or otherwise was not immediately apparent through CCAT's initial investigation.

19.    MATTCO and DOES 1 through 10 are referred to collectively throughout this Complaint as Defendant or Defendants.

## IV.    <u>LEGAL BACKGROUND</u>

### A.    The Clean Water Act.

COMPLAINT

5

20.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the statute. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of NPDES permits issued pursuant to section 402 of the Act, 33 U.S.C. §§ 1311(a) and 1342(b). The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

21.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

22.     The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

23.     The Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.  *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

24.     A significant nexus is established if the water in question "either alone or

in combination with similarly situated lands in the region, significantly affect the

chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547

U.S. at 780; *N. Cal. River Watch*, 496 F.3d at 999-1000.

25.    Section 505(a)(1) of the Act provides for citizen enforcement actions

against any "person" who is alleged to be in violation of an "effluent standard or

limitation…or an order issued by the Administrator or a State with respect to such a

standard or limitation."  *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

26.    Defendant MATTCO is a "person" within the meaning of section 502(5)

of the Act.  *See* 33 U.S.C. § 1362(5).

27.    An action for injunctive relief is authorized under section 505(a) of the

Act. *See* 33 U.S.C. § 1365(a)(1).

28.    Each separate violation of the Act subjects the violator to a penalty of up

to $51,570 per day for violations occurring after November 2, 2015; and up to

$37,500 per day per violation for violations occurring prior to and including

November 2, 2015.  *See* 33. U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4

(Adjustment of Civil Monetary Penalties for Inflation).

29.    Section 505(d) of the Act allows prevailing or substantially prevailing

parties to recover litigation costs, including fees for attorneys, experts, and

consultants.  *See* 33 U.S.C. § 1365(d).

**B.    California's Storm Water Permit.**

30.    The State Board is charged with regulating pollutants to protect

California's water resources.  *See* Cal. Water Code § 13001.

31.    Section 402(p) of the Act establishes a framework for regulating industrial storm water discharge under the NPDES permit program. 33 U.S.C. § 1342(p).

32.    Section 402(b) of the Act allows each state to administer an EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.  *See* 33 U.S.C. § 1342(b).

33.    States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers.  *See* 33 U.S.C. § 1342(b).

34.    California is a state authorized by EPA to issue NPDES permits. The Permit is a statewide general NPDES permit issued by the State Board pursuant to the Act.

35.    Between 1997 and June 30, 2015, the Permit in effect in California was Order No. 97-03-DWQ, which CCAT refers to herein as the "1997 Permit."

36.    On July 1, 2015, California re-issued the Permit pursuant to Order No. 2014-0057-DWQ's NPDES, which is referred to herein as the "2015 Permit."

37.    The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more so, than the terms of the 1997 Permit. *See* 2015 Permit, Findings, ¶ 6.

COMPLAINT

38.    Prior to beginning industrial operations, dischargers are required to apply for coverage under the Permit by submitting a NOI to the State Board. 1997 Permit, Finding #3; 2015 Permit, Findings, ¶ 17.

39.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Permit and comply with its terms, or obtain and comply with an individual NPDES permit.  1997 Permit, Finding #2; 2015 Permit, Findings, ¶ 12.

40.    Compliance with the Permit constitutes compliance with the Act for purposes of storm water discharges.  33. U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, violations of the Permit are violations of the Act. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

**C.    The Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

41.    The Permit contains a Discharge Prohibition on the direct or indirect discharge of materials other than storm water ("non-storm water discharges") that is not otherwise authorized by an NPDES permit to waters of the United States. 1997 Permit, Section A(1); 2015 Permit, Section III(B).

42.    The Permit contains an Effluent Limitation that requires permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control

Technology ("BCT") for conventional pollutants.  40 C.F.R. §§ 401.15-16; 1997
Permit, Section B(3); 2015 Permit, Section V(A).  BAT and BCT include both
structural (e.g. installation of curbs to direct storm water flows) and non-structural
(e.g. sweeping) measures.

43.     In order to comply with the statutory BAT/BCT mandate, covered
facilities must implement site-specific structural and non-structural Best Management
Practices ("BMPs") designed to prevent or reduce discharges with pollutant
concentrations that violate the Permit, and therefore the Act.

44.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial
Activities ("MSGP") include numeric benchmarks for pollutant concentrations in
storm water discharges ("EPA Benchmarks") that are numeric thresholds to aid in
determining whether a facility discharging industrial storm water had implemented the
requisite BAT and/or BCT as mandated by the Act.  *See* United States Environmental
Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges
Associated with Industrial Activity, as modified effective May 9, 2009.

45.     EPA's Benchmarks serve as objective measures for evaluating whether
the BMPs designed and implemented at a facility achieve the statutory BAT/BCT
standards.  *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* MSGP,
73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); *see also* MSGP, 65 Fed. Reg. 64,746,
64,766-67 (Oct. 30, 2000).

46.     The State Board established Numeric Action Levels ("NALs") in the

2015 Permit.  *See* 2015 Permit, Section V(A).  NALs are derived from, and function similar to, EPA benchmarks.  *See* 2015 Permit Fact Sheet, Section I(D)(5).  NALs and Benchmarks represent pollutant concentrations at which a storm water discharge could impair, or contribute to impairing, water quality and/or affect human health.

47.     The Permit also contains various Receiving Water Limitations.  1997 Permit, Receiving Water Limitation C(1)-(2); 2015 Permit, Section VI(A).  Receiving Waters are those surface or other waters to which pollutants are discharged from a given facility.

48.     The first Receiving Water Limitation is that stormwater discharges shall not cause or contribute to an exceedance of any applicable water quality standard ("WQS").  *Id*.

49.     WQS are pollutant concentration levels determined by the State Board, the various regional boards and/or the EPA to be protective of the beneficial uses of the water that receive polluted discharges.  WQS applicable to the discharges covered by the Permit include, but are not limited to, those set out in the *Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties*[1], California Regional Water Quality Control Board, Los Angeles Region 4 (adopted June 13, 1994, as amended) ("Basin Plan") and in the Criteria for Priority Toxic Pollutants for the State of California (a.k.a. California

---

[1] *Available at* http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/.

COMPLAINT

11

Toxics Rule or "CTR"). 65 Fed. Reg. 31712 (May 18, 2000); 40 C.F.R. § 131.38.

50.    The second Receiving Water Limitation is that storm water discharges shall not adversely impact human health or the environment. 1997 Permit, Receiving Water Limitation C(1); 2015 Permit, Section VI(B).

51.    The third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. *See* 2015 Permit, Section VI(C).

52.    A facility is in violation of the Permit's Receiving Water Limitation when its storm water discharges contain pollutant levels that: i) exceed an applicable WQS; ii) exceed levels known to adversely impact aquatic species and the environment; or iii) threaten to cause pollution.

53.    The Facilities' stormwater discharges drain first to Reach 2 of the Los Angeles River ("River"), through Reach 1 of the River, the Los Angeles River Estuary and the San Pedro Bay, and ultimately to the Pacific Ocean via (collectively "Receiving Waters").

54.    The Regional Board identifies beneficial uses of the Receiving Waters and establishes water quality standards in the Basin Plan.  The beneficial uses of the Receiving Waters include municipal and domestic water supply, groundwater recharge, water contact recreation,[2] non-contact water recreation,[3] warm freshwater

---

[2] Contact recreation use includes fishing and wading.  Basin Plan at 2-2.
[3] Non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water,

COMPLAINT

12

habitat, wildlife habitat, wetland habitat, marine habitat, rare, threatened, or endangered species, preservation of biological habitats, migration of aquatic organisms, spawning, reproduction and/or early development, and shellfish harvesting.

55.    The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."  Basin Plan at 3-38.

56.    The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."  Basin Plan at 3-29.

57.    The Basin Plan provides that "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses."  Basin Plan at 3-37.

58.    The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use."  Basin Plan at 3-24.

---

but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."  Basin Plan at 2-2.

COMPLAINT

13

59.    The Basin Plan provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-26.

60.    The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses." Basin Plan at 3-25.

61.    The Basin Plan provides that "[w]aters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-38.

62.    The Basin Plan provides that "[w]aters shall not contain taste or odor-producing substances in concentrations that impart undesirable tastes or odors to fish flesh or other edible aquatic resources, cause nuisance, or adversely affect beneficial uses." Basin Plan at 3-37.

63.    The U.S. EPA has adopted freshwater numeric water quality standards in the CTR for zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC"), for copper of 0.013 mg/L (CMC), cadmium of 0.0043 mg/L (CMC), and for lead of 0.0025 mg/L (Criteria Continuous Concentration – "CCC").[4]

64.    According to the 2012 303(d) List of Impaired Water Bodies,[5] Reaches 1 and 2 of the Los Angeles River are impaired by various pollutants, including pH, cyanide, diazinon, lead, nutrients, ammonia, cadmium, coliform bacteria, copper, trash, zinc, and oil. The Los Angeles River Estuary is impaired by, among other

---

[4] These values are expressed as a function of total hardness (mg/L) in the water body and correspond to a total hardness of 100 mg/L, which is the default listing in the California Toxics Rule.
[5] *Available at* http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml

COMPLAINT                                                  14

pollutants, chlordane, sediment toxicity, and trash.[6]  The Los Angeles/Long Beach

Harbor is impaired by at least chrysene, copper, sediment toxicity, mercury, and zinc.[7]

The San Pedro Bay is impaired by sediment toxicity, and the Long Beach City Beach,

one of the San Pedro Bay beaches, is impaired by indicator bacteria.[8]

65.    The Receiving Waters are ecologically significant.  Although pollution

and habitat destruction have drastically altered the natural ecosystem, the Receiving

Waters are still essential habitat for dozens of fish and bird species, as well as macro-

invertebrate and invertebrate species.  Storm water and non-storm water contaminated

with sediment, heavy metals, and other pollutants harm the special aesthetic and

recreational significance the Receiving Waters have for people in surrounding

communities, including CCAT's members. The public's use of the Receiving Waters

for water contact sports and fishing exposes many people to toxic metals, pathogens,

bacteria and other contaminants in storm water and non-storm water discharges.  Non-

contact recreational and aesthetic opportunities, such as wildlife observation, are also

impaired by polluted discharges to the Receiving Waters.

66.    Discharges of pollutants at levels above WQS contribute to the

impairment of the beneficial uses of the waters receiving the discharges and constitute

violations of the Permit and Act.

67.    Discharges with pollutant levels in excess of the CTR criteria, the Basin

---

[6] *Id.*
[7] *Id.*
[8] *Id.*

COMPLAINT

15

Plan standards, and/or other applicable WQS are violations of the Permit's Receiving

Water Limitations.  WQS applicable to the Facilities include, but may not be limited

to, those detailed in TABLE 1.  MATTCO must analyze all stormwater samples for

these parameters.

**TABLE 1**

WATER QUALITY STANDARDS APPLICABLE TO MATTCO'S FACILITIES

| Parameter | Source | Numeric Limit |
|---|---|---|
| pH | Basin Plan | 6.5-8.5 s.u. |
| Al | Basin Plan | 1.0 mg/L |
| Cu | CTR | 0.013 mg/L (Criteria Max. Concentration[9]) |
| Zn | CTR | 0.120 mg/L (Criteria Max. Concentration) |
| Pb | CTR | 0.065 mg/L (Criteria Max. Concentration) |
| Ni | CTR | 0.470 mg/L (Criteria Max. Concentration) |
| Cd | CTR | 0.0043 mg/L (Criteria Max. Concentration) |
| Cr (VI) | CTR | 0.016 mg/L (Criteria Max. Concentration) |

68.    Benchmarks and/or NALs established for conventional and industry

specific pollutants discharged from the Facilities, and for which MATTCO must

analyze stormwater samples, are summarized below at TABLE 2.

---

[9] Criteria Maximum Concentration ("CMC") equals the highest concentration of a pollutant to which aquatic
life can be exposed for a short period of time without deleterious effects.

COMPLAINT

**TABLE 2**

BENCHMARK AND NAL VALUES APPLICABLE TO MATTCO'S FACILITIES

| PARAMETER/ POLLUTANT | EPA BENCHMARK | ANNUAL NAL | INSTANTANEOUS MAXIMUM NAL |
|---|---|---|---|
| pH | 6.0-9.0 s.u. | n/a | 6.0-9.0 s.u. |
| TSS | 100 mg/L | 100 mg/L | 400 mg/L |
| O&G | 15 mg/L | 15 mg/L | 25 mg/L |
| SC | 200 uhmos/cm | 200 uhmos/cm | n/a |
| TOC | 110 mg/L | 110 mg/L | n/a |
| COD | 120 mg/L | 120 mg/L | n/a |
| Al | 0.75 mg/L | 0.75 mg/L | n/a |
| N+N | 0.68 mg/L | 0.68 mg/L | n/a |
| Fe | 1.0 mg/L | 1.0 mg/L | n/a |
| Zn | 0.117 mg/L | 0.26 mg/L | n/a |
| Ni | 1.02 mg/L | 1.02 mg/L | n/a |
| Mg | 0.064 mg/L | 0.064 mg/L | n/a |
| Cu | 0.0332 mg/L | 0.0332 mg/L | n/a |
| Pb | 0.0816 mg/L | n/a | n/a |

**D.     The Permit's Planning and BMP Design Requirements.**

69.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Sections A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54) and X(B).

70.     The SWPPP must identify and evaluate sources of pollution associated with industrial activities that may affect the quality of stormwater, and authorized non-stormwater discharges from the facility.  1997 Permit, Section A(2); 2015 Permit,

1    Section X(G).

2        71.    The SWPPP must identify and describe site-specific BMPs to reduce or

3
4    prevent pollutants associated with industrial activity in storm water and authorized

5    non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H).

6        72.    The SWPPP must also include BMPs that achieve pollutant discharge

7
8    reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015

9    Permit, Section I(D) (Finding 32), Section X(C).

10        73.    The SWPPP must include: i) a narrative description and summary of all

11
12    industrial activity, potential sources of pollution, and potential pollutants; ii) a site

13    map indicating the storm water conveyance system, associated points of discharge,

14
15    direction of flow, areas of actual and potential pollutant contact, including the extent

16    of pollution-generating activities, nearby water bodies, and pollutant control

17    measures; iii) a description of storm water management practices; iv) a description of

18
19    the BMPs to be implemented to reduce or prevent pollutants in storm water discharges

20    and authorized non-storm water discharges; v) the identification and elimination of

21
22    non-storm water discharges; vi) identify and locate where materials are being shipped,

23    received, stored, handled, as well as typical quantities of such materials and the

24
25    frequency with which they are handled; vii) a description of dust and particulate

26    generating activities; and viii) a description of individuals and their current

27    responsibility for developing and implementing the SWPPP. 1997 Permit, Section

28    A(1)-(10); 2015 Permit, Section X.

COMPLAINT                                    18

74.     The 2015 Permit further requires certain SWPPP enhancements,
including a more comprehensive assessment of potential pollutant sources and more
specific BMP descriptions.  *See* 2015 Permit Sections X(G)(2), (4), (5).

75.     The objectives of the SWPPP are to: i) identify and evaluate sources of
pollutants associated with industrial activities that may affect the quality of storm
water discharges; ii) to identify, design and implement site-specific BMPs to prevent
the exposure of pollutants to storm water; and iii) to reduce or prevent the discharge
of polluted storm water from industrial facilities.  1997 Permit, Section A(2); 2015
Permit, Section X.

76.     To ensure compliance, the SWPPP must be evaluated and revised as
necessary.  *See* 1997 Permit Sections A(9)-(10); *see also* 2015 Permit § X(B).

77.     Failure to develop or implement an adequate SWPPP (or revise an
existing SWPPP, as necessary) constitutes an independent Permit violation.  *See* 2015
Permit, Fact Sheet, Section I(1).

78.     The Permit also requires that the discharger conduct an annual
comprehensive site compliance evaluation that includes a review of all visual
observation records, inspection reports and sampling analysis data, a visual inspection
of all potential pollutant sources for evidence of, or the potential for, pollutants
entering the drainage system, a review and evaluation of all BMPs to determine
whether the BMPs are adequate, properly implemented and/or maintained, or whether
additional BMPs are needed, and a visual inspection of equipment needed to

implement the SWPPP.  1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

79.    Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification or personnel performing the evaluation, date(s) of the evaluation(s) necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Permit. 1997 Permit; Section A(9)(d)(i)-(vi).  If certification cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance. 1997 Permit, Section A(9)(d).  The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Permit.  1997 Permit, Section A(9)(d).

**E.    The Permit's Monitoring and Reporting Requirements.**

80.    The 1997 Permit required facility operators to develop and implement a monitoring and reporting program ("M&RP") when industrial activities begin at the facility. 1997 Permit, Sections B(1)-(2) and E(3).  The 2015 Permit also requires implementation of a M&RP.  2015 Permit, Sections X(I) and XI.

81.    The objectives of the M&RP are to inform discharges about the effectiveness of BMPs designed in the planning phase and implemented on the ground.  Where the M&RP indicates that BMPs are not adequate to prevent or reduce pollutants in storm water discharges, permittees have an obligation to re-design BMPs and/or improve BMP implementation as necessary to ensure that storm water

discharges are in compliance with the Permit's Discharge Prohibitions, Effluent Limitations and Receiving Water Limitations.  *See* 1997 Permit, Section B(2); *see also* 2015 Permit, Sections X(I) and XI.

82.     The 2015 Permit requires facility operators to visually observe, monitor and sample storm water discharges to ensure that the facility is complying with its obligations under the Permit.  2015 Permit, Sections I(J) (Findings 55-56) and XI.

83.     The M&RP must be revised as necessary to ensure Permit compliance. 1997 Permit, Section B(2)(d); 2015 Permit, Section XI(A)(4).

84.     Discharges must conduct monthly visual observations of storm water discharges as part of a legally adequate M&RP.  1997 Permit, Section B(4)(a); 2015 Permit, Section XI(A).

85.     Dischargers must observe and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in a discharge, and the source of any pollutants in storm water discharges from the facility.

86.     Dischargers are required to maintain detailed records of each observation, and corrective action taken to reduce or prevent pollutants from contacting storm water discharges.  *See* 1997 Permit, Section B(4)(c); *see also* 2015 Permit, Section XI(A)(3).

87.     The Permit requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants from entering surface waters from the facility.  1997 Permit, Section B(4)(c), 2015 Permit, Section

COMPLAINT

21

XI(B)(1).

88.     The Permit requires dischargers to visually observe and collect samples of storm water discharges from each location where storm water is discharged.  1997 Permit, Sections B(5) and B(7); 2015 Permit, Section XI(B)(4).

89.     Section B(5)(a) of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

90.     Section B(5)(b) required that sampling conducted pursuant to the 1997 Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

91.     Section XI(B)(1) of the 2015 Permit requires sampling from a Qualifying Storm Event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

92.     Dischargers are required to collect samples of storm water within 4 hours of the start of facility operations if the QSE began within the previous 12-hour period, e.g. for storms with discharges that begin during the night for facilities with day-time

operations. 2015 Permit, Section XI(B)(5)(b).

93.     Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

94.     Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via SMARTS within thirty (30) days of obtaining all results for each sampling event.

95.     The Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and either total organic carbon ("TOC") or Oil & Grease ("O&G").  1997 Permit, Section B(5)(c)(i); 2015 Permit, Sections XI(B)(6)(a)-(b).

96.     The Permit also requires dischargers to analyze each sample for site-specific toxic chemicals and other pollutants associated with the specific industrial operations at the facility.  1997 Permit, Section B(5)(c)(ii); 2015 Permit, Section XI(B)(6)(c).

97.     Section XI(B)(6) of the 2015 Permit requires dischargers to analyze storm water samples for additional industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

98.     According to information and belief, CCAT alleges that the parameters applicable to MATTCO pursuant to the requirements summarized in paragraphs 96

and 97 are detailed above in TABLE 1 and TABLE 2.

99.    Section B(14) of the 1997 Permit required that dischargers submit an

Annual Report to the applicable Regional Board by July 1 of each year. The Annual

Report must include a summary of visual observations and sampling results, an

evaluation of the visual observations and sampling and analysis results, laboratory

reports, the annual comprehensive site compliance evaluation report specified in

Section A(9), an explanation of why a facility did not implement any activities

required, and the records specified in Section B(13)(i).

100.    Section XVI of the 2015 Permit requires dischargers to submit a

Compliance Checklist with each Annual Report that indicates whether the discharger

complies with, and has addressed all applicable requirements of the 2015 Permit, an

explanation for any noncompliance of requirements within the reporting year, as

indicated in the Compliance Checklist, an identification, including page numbers

and/or sections, of all revisions made to the SWPPP within the reporting year, and the

date(s) of the Annual Evaluation.

V.    **STATEMENT OF FACTS**

   **A.    The Facilities.**

101.    The NOI for MATTCO on file with the Regional Board lists the

Facilities' Waste Discharger Identification No. as 4 19I025496 for the Minnesota

Avenue facility.  The NOI contains no reference to and contains no information about

MATTCO's industrial activity on Jackson Street.  Similarly, the SWPPP dated May

22, 2015 on file with the Regional Board makes no reference to and contains no

information about industrial activity on Jackson Street.

102.    The NOI certifies that the Facilities cover 4 acres.

103.    According to information available to CCAT, the Facilities are metal

forging operations.  Activities include the development, design, manufacture and

testing of engineered forged metal products for aerospace, defense, oil & gas,

transportation and power generation industries.

104.    The MATTCO website indicates the use of the following forging

materials at the Facilities: nickel (Ni), cobalt (Co), titanium (Ti), aluminum (Al),

magnesium (Mg), steel, stainless steel, carbon and various "super" alloys.

105.    The Facilities' SWPPP contains no specific reference to any of these

materials.

106.    U.S. EPA's Industrial Storm Water Fact Sheet for AA: Fabricated Metal

Products Manufacturing Facilities[10] indicates that polluted discharges from industrial

activities like those conducted at the Facilities commonly contain substances affecting

pH; metals, such as iron, aluminum, and nickel; toxic metals, such as lead, zinc,

cadmium, chromium, and copper; organics; chemical oxygen demand ("COD");

biological oxygen demand ("BOD"); total suspended solids ("TSS")[11]; fuel additives,

---

[10] *Available at* https://www3.epa.gov/npdes/pubs/sector_aa_fabmetal.pdf
[11] High concentrations of TSS degrade optical water quality by reducing water clarity and decreasing light available to
support photosynthesis. TSS has been shown to alter predator prey relationships (for example, turbid water may make it
difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be
harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are

COMPLAINT                                                    25

gas/diesel fuel, oil and grease ("O&G"); coolants and solvents; acid/alkaline waste; and, trash and debris. EPA's Industrial Storm Water Fact Sheet for Sector AB: Transportation Equipment, Industrial, or Commercial Machinery Manufacturing Facilities[12] indicates that polluted discharges from industrial activities like those conducted at the Facilities commonly contain TSS; O&G; organics; solvents; acid/alkaline wastes; heavy metals; toxic metals such as lead, arsenic, cadmium, and chromium; COD; gasoline and diesel. Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and developmental or reproductive harm. Discharges of polluted storm water to the local surface waters pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment.

**B.    The Facilities' Discharges and Receiving Waters.**

107.    The Facilities are located approximately 1.3 miles east of the Los Angeles River.

108.    The SWPPP describes two discharge points at the Minnesota Avenue facility—identified and sampled as Outfall #1 and Outfall #2—both of which are located within the Facilities' borders.

109.    According to the SWPPP, the majority of stormwater discharged by

---

absorbed onto TSS. Thus, higher concentrations of TSS results in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.
[12] *Available at* https://www.epa.gov/sites/production/files/2015-10/documents/sector_ab_transport.pdf.

COMPLAINT

MATTCO enters local storm drains operated by the County of Los Angeles via inlets located within the Facilities' borders, and then travel below grade to the Los Angeles River and other Receiving Waters (described in paragraph 53 above).

110.    The SWPPP (at page 10) also indicates that some stormwater, specifically stormwater potentially contaminated by contact with Hazardous Material and Hazardous Waste Storage, is discharged in "sheet flow" onto Minnesota Avenue.

111.    The SWPPP contains no description of discharge or discharge points at the Jackson Street address.

112.    CCAT is informed and believes, and thereon alleges, that each of the Receiving Waters is a water of the United States.

113.    CCAT is informed, believes, and thereon alleges that the Facilities' polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in the Receiving Waters.

114.    On information and belief, CCAT alleges that storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance the Receiving Waters have for people in surrounding communities, including CCAT members.

115.    The public's use of the Receiving Waters for water contact sports and fishing exposes many people to toxic metals, pathogens, bacteria and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also

COMPLAINT                                                      27

impaired by polluted discharges to the Receiving Waters.

## VI.    VIOLATIONS OF THE CLEAN WATER ACT AND PERMIT

116.    During the period before (Jan. 1992-May 2015) and since (May 2015-present) enrolling in the Permit, MATTCO has failed to carry out its obligations under Permit and Act.

117.    The Facilities are in ongoing violation of the Permit, and violations span both the 1997 Permit and 2015 Permit.

118.    MATTCO has failed to conduct requisite monitoring/sampling of stormwater discharges; failed to develop a legally adequate M&RP; failed to develop, implement and/or update a legally adequate SWPPP to ensure the development and implementation of BMPs that achieve BAT/BCT; and certified and filed demonstrable false Annual Reports.

119.    MATTCO is subject to civil penalties for all violations of the Clean Water Act detailed below occurring since March 2, 2012.

120.    On information and belief, Plaintiff alleges that the Facilities' have failed and continue to fail to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve BAT/BCT as required by the Act and Permit.

### A.    Ongoing Violations of the Permit's M&RP Requirements.

121.    MATTCO has been and continues to conduct operations at the Facilities with a legally inadequate M&RP.

COMPLAINT

28

122.   Information available to CCAT indicates that the Facilities have failed and continue to fail to collect and analyze qualifying storm events as required by the Permit.  Based on information and belief, CCAT alleges that MATTCO did not take a single sample until 2017.

123.   During the 2011-2012, 2012-2013, and 2013-14 Permit periods (July 1- June 30), the Facilities were operating without having enrolled in the Permit, and conducted no sampling or analysis of storm water data in violation of the Act.

124.   Despite having certified on June 19, 2015 at page 8 of its Annual Report for 2014-2015 that "[t]he facility immediately implemented a storm-water monitoring plan [upon] receiv[ing] coverage under the Industrial General Permit for Storm Water Discharges in May of 2015," MATTCO failed to collect or analyze storm water samples during two qualifying storm events on Friday May 8, 2015 and Thursday May 14, 2015.  Both of these storm events were sampled by neighboring facilities.

125.   On June 17, 2016, MATTCO again wrongly certified on page 5 of its Annual Report that "[d]uring the 2015-2016 storm season, there were no storm water discharge events, during scheduled facility operating hours that met all of the parameters in the general permit.  Therefore, no samples were taken."

126.   Information available to CCAT demonstrates that MATTCO's claim is false.  During the relevant timeframe there were as many as fifteen qualifying storm events, nearly all of which were sampled by at least one industrial facility in the City of Paramount.

COMPLAINT

127.    MATTCO's failure to conduct sampling and monitoring as required by the Permit demonstrates that it has failed to develop, implement, and/or revise a legally adequate M&RP, and is therefore violating the Act.

128.    MATTCO has failed and continues to fail to analyze samples for all parameters required by the Permit.

129.    MATTCO has failed and continues to fail to collect samples from all discharge locations at the Facilities.

130.    On information and belief, CCAT alleges that MATTCO has failed and continues to fail to submit Annual Reports that comply with the Permit's reporting requirements. MATTCO has falsely certified that: (1) a complete Annual Comprehensive Site Compliance Evaluation was done pursuant to the Permit; (2) the SWPPP's BMPs address existing potential pollutant sources and additional BMPs are not needed; and (3) the SWPPP complies with the Storm Water Permit, or will otherwise be revised to achieve compliance. Information available to CCAT indicates that these certifications are erroneous. For example, storm water samples collected from the Facilities contain concentrations of pollutants above Benchmarks and WQS, thus demonstrating that the SWPPP's BMPs do not adequately address existing potential pollutant sources.

**B.    Failure to Prepare, Implement, Review and Update an Adequate SWPPP; Failure to Develop and/or Implement Adequate BMPs.**

131.    On information and belief, CCAT alleges that MATTCO is operating, as

of May 18, 2017, without a legally adequate SWPPP or M&RP.  MATTCO has failed and continues to fail to adequately develop, implement and/or revise a legally adequate SWPPP in violation of the Permit and Act.

132.   MATTCO's SWPPP fails to describe legally adequate BMPs for any pollutants at the Jackson Street facility.

133.   The Facilities' SWPPP fails to adequately identify and evaluate industrial processes and sources of pollution as required by the Permit and Act.  *See* 2015 Permit, Section X(A)(4)-5) & (C)(1)(a).  For example, the SWPPP does not acknowledge, identify or evaluate "outdoor processing areas" or "outdoor work areas," both of which are described in expert sources on which the SWPPP is purportedly based.

134.   Information available to CCAT from a reconnaissance visit to the Facilities on Dec. 8, 2016 documented extremely concerning industrial activities taking place outdoors without being mentioned or evaluated in the SWPPP.

135.   CCAT witnessed as many as 5 workers wearing industrial suits (full body/head cover and breathing/filter system) grinding donut-shaped metal parts (approx. 12"-15" diameter) with medium-sized power grinders (using approx. 5"-7" abrasive discs) in an outdoor, unenclosed location identified on the site map as "grinding area."

136.   The SWPPP fails to describe and develop adequate BMPs.  Despite the obvious potential for grinding activities to result in pollutants likely to affect the

quality of industrial storm water, the word "grinding" appears only 3 times in the SWPPP, and not once to describe an industrial activity.  The only BMPs described for any outdoor industrial activities are: 1) elevating metal materials; 2) a generic reference to "good housekeeping;" 3) inspecting outdoor areas; 4) employee training; and 5) locking gates to restrict access.  CCAT alleges these BMPs are insufficient to meet the Act's mandate and the Permit's requirements.

137.   The SWPPP fails to describe adequate BMPs to address the "sheet flow" onto Minnesota Avenue that is potentially contaminated by the Facilities' hazardous material and waste storage area.

138.   MATTCO's SWPPP fails to identify or describe any specific metals as potential pollutants.

139.   The SWPPP lacks essential details in identifying pollutants, evaluating pathways of exposure and describing site-specific BMPs.  At no point does the SWPPP elaborate on specific processes used on the various metals present at the site (grinding, cutting, sawing, deburring, melting, etc.), the potential pathways by which the different metals might be exposed to storm water, or specific BMPs to address the various pathways (broom sweeping vs. regenerative sweeper truck).

140.   On information and belief, CCAT alleges that MATTCO has failed and continues to fail to develop and implement adequate BMPs more generally.  CCAT witnessed and documented substantial quantities of raw materials, finished materials, waste products and trash on the ground and fully exposed to the elements without the

COMPLAINT

benefit any observable BMPs.

141.   CCAT believes and alleges that MATTCO is under an obligation, given the overall layout and use of the Facilities' campus, to develop and implement exposure minimization BMPs.  However, the SWPPP cursorily concludes its assessment of such BMPs by stating that the are "[n]ot applicable to this facility."

142.   Information available to CCAT indicates that the Facilities have failed and continue to fail to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve BAT/BCT as required by the Act through the Permit.

143.   Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in
Violation of the Permit Effluent Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

144.   CCAT re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

145.   CCAT is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities through the implementation of BMPs at the Facilities that achieve BAT/BCT.

146.    CCAT is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facilities occur every time storm water is discharged. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facilities is a violation of the Storm Water Permit and the Act. *See* 1997 Permit, Effluent Limitation B(3); *see also* 2015 Permit, Section I(D) (Finding 32), Section V(A); *see also* 33 U.S.C. § 1311(b).

147.    Defendants violate and will continue to violate the Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facilities.

148.    Each and every violation of the Permit's Effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

149.    Defendants' violations of the Permit's Effluent Limitations and the Act are ongoing and continuous.

150.    By committing the acts and omissions alleged above, MATTCO is subject to an assessment of civil penalties for each and every violation of the Act occurring from March 2, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

151.    An action for injunctive relief is authorized by section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which

COMPLAINT

harm CCAT has no plain, speedy, or adequate remedy at law.

152.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**SECOND CAUSE OF ACTION**
**Defendant's Discharges of Contaminated Storm Water in**
**Violation of the Permit's Receiving Water Limitations and the Act**
**(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

153.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

154.   CCAT is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facilities occur each time storm water discharges from the Facilities.

155.   CCAT is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has been discharged and continues to be discharged from the Facilities each time stormwater is discharged from the Facilities.

156.   Plaintiff is informed and believes, and thereupon alleges, that since at least March 2, 2012, Defendants have discharged polluted storm water from the Facilities

COMPLAINT

35

causing or contributing to the violation of the applicable WQS and that adversely

impact human health or the environment in violation of the Receiving Water

Limitation of the General Permit.

157.   Every day, since at least March 2, 2012, that Defendants have discharged

polluted storm water from the Facilities in violation of the Permit is a separate and

distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations

are ongoing and continuous.

158.   Each and every violation of the Storm Water Permit's Receiving Water

Limitations is a separate and distinct violation of section 301(a) of the Act, 33 U.S.C.

§ 1311(a).

159.   By committing the acts and omissions alleged above, MATTCO is

subject to an assessment of civil penalties for each and every violation of the Act

occurring from March 2, 2012 to the present, pursuant to sections 309(d) and 505 of

the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

160.   An action for injunctive relief is authorized by Act section 505(a),

33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

would irreparably harm Plaintiff and the citizens of the State of California, for which

CCAT has no plain, speedy, or adequate remedy at law.

161.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

because an actual controversy exists as to the rights and other legal relations of the

Parties.

COMPLAINT

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**THIRD CAUSE OF ACTION**
**Defendant's Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

162.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

163.    Defendants have not developed and implemented an adequate SWPPP for the Facilities.

164.    Each day since March 2, 2012, that Defendants do not develop, implement and update an adequate SWPPP for the Facilities is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

165.    Defendants have been in violation of the SWPPP requirements every day since March 2, 2012.  Violations continue each day that an adequate SWPPP for the Facilities is not developed and fully implemented.

166.    By committing the acts and omissions alleged above, MATTCO is subject to an assessment of civil penalties for each and every violation of the Act occurring from March 2, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

167.    An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

COMPLAINT

37

would irreparably harm Plaintiff and the citizens of the State of California, for which harm CCAT has no plain, speedy, or adequate remedy at law.

168.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Defendant's Failure to Develop and Implement an
Adequate Monitoring and Reporting Program
(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

169.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

170.    Defendants have not developed and implemented an adequate monitoring and reporting program for the Facilities.

171.    Each day since March 2, 2012, that Defendants have not developed and implemented an adequate monitoring and reporting program for the Facilities in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite collection/monitoring and analytical results are ongoing and continuous.

172.    By committing the acts and omissions alleged above, MATTCO is subject to an assessment of civil penalties for each and every violation of the Act

COMPLAINT

38

occurring from March 2, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

173.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm CCAT has no plain, speedy, or adequate remedy at law.

174.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Accurately Certify Compliance in Annual Reports in Violation of the Permit and the Act**
**(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

175.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

176.   Defendants have not accurately certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least March 2, 2012.

177.   Each day since at least March 2, 2012, that Defendants do not accurately certify compliance with the General Permit is a separate and distinct violation of the

COMPLAINT

39

General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants continue to be in violation of the General Permit's certification requirement each day they maintain an inaccurate certification of compliance with the General Permit.

178.     By committing the acts and omissions alleged above, MATTCO is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 2, 2011 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

179.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm CCAT has no plain, speedy, or adequate remedy at law.

180.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant(s) to have violated and to be in violation of the Act as alleged herein;

COMPLAINT

40

1    b.  Enjoin Defendant(s) from discharging polluted storm water from the

2  Facilities unless authorized by the Permit;

3    c.  Enjoin Defendant(s) from further violating the substantive and

4

5  procedural requirements of the Permit;

6    d.  Order Defendant(s) to immediately implement storm water pollution

7

8  control technologies and measures that are equivalent to BAT or BCT and prevent

9  pollutants in the Facilities' storm water from contributing to violations of any water

10

11  quality standards;

12    e.  Order Defendant(s) to comply with the Permit's monitoring and

13  reporting requirements, including ordering supplemental monitoring to compensate for

14

15  past monitoring violations;

16    f.  Order Defendant(s) to prepare a SWPPP consistent with the Permit's

17  requirements and implement procedures to regularly review and update the SWPPP;

18

19    g.  Order Defendant(s) to provide Plaintiff with reports documenting the

20  quality and quantity of their discharges to waters of the United States and their efforts

21  to comply with the Act and the Court's orders;

22

23    h.  Order Defendant(s) to pay civil penalties of up to $37,500 per day per

24  violation for each violation of the Act since March 21, 2012, up to and including

25

26  November 2, 2015, and up to $51,570 for violations occurring after November 2, 2015

27  pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and

28

40 C.F.R. §§ 19.1 - 19.4;

COMPLAINT

1         i.  Order Defendant(s) to take appropriate actions to restore the quality of

2    waters impaired or adversely affected by their activities;

3
4         j.  Award Plaintiff's costs (including reasonable investigative, attorney,

5    witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

6    § 1365(d); and,

7
8         k. Award any such other and further relief deemed appropriate by the

9    Court.

10

11

12    Dated: MAY  19  , 2017            Respectfully submitted,

13

14                                  By:  _____
                                          Jesse C. Swanhuyser
15                                        Attorney for Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
                                                42